In the Matter of VILLAGE OF TULLY et al., Appellants, v WILLIAM A. HARRIS, Individually and as Onondaga County Commissioner of Health, et al., Respondents.

Fourth Department, July 11, 1986

## APPEARANCES OF COUNSEL

*Scott F. Chatfield* for Village of Tully, appellant.

*Emil M. Rossi (Kenneth J. Bobrycki* and *Richard M. Storto* of counsel), for Village of Baldwinsville, appellant.

*Robert J. Rossi, County Attorney (Christopher Mack* and *Kenneth S. Goldman* of counsel), for respondents.

## OPINION OF THE COURT

SCHNEPP, J.

The appeal in this CPLR article 78 proceeding is from the judgment dismissing the petition which sought to annul the order of the Commissioner of Health of Onondaga County requiring fluoridation of the Village of Tully's public water supply. The Village of Baldwinsville received a similar order and was permitted to intervene in this proceeding as a copetitioner. The orders state that before adding fluoride compounds a public water "supplier must * * * make written application to and receive approval from the State Commissioner of

Health" and direct that each village "take all necessary steps" to comply therewith. The Onondaga County Sanitary Code clothes the Commissioner of Health with the authority to require fluoridation in compliance with the New York State Sanitary Code which prescribes that fluoridation must be approved by the State Commissioner of Health *(see,* 10 NYCRR 5-1.24). The villages claim that the provisions of the Onondaga County Charter, adopted by the County Board of Supervisors in 1961, which pertain to the creation and administration of the county health district and Department of Health (Onondaga County Charter art XVI), and the Sanitary Code, which was adopted by the County Legislature in 1968 pursuant to the Charter, are inconsistent with the Public Health Law and thereby null and void.

■ Special Term held that the Onondaga County Charter and Sanitary Code are constitutionally valid and proper. We agree and so declare. In our view, the provisions of the Charter and Sanitary Code supersede the requirements of the Public Health Law.

Guidelines for the establishment and organization of county and part-county health districts are found in Public Health Law, article 3, title III (§§ 340-357). Section 340 (1) directs that "[t]he board of supervisors of any county, with the approval of the [State] commissioner shall have power to establish a county * * * health district and in such event shall appoint a board of health". Section 343 (1) provides that the board of health of a county "shall consist of seven members". Section 347 (1) empowers a county board of health to "exercise all the powers and perform all duties of local boards of health as provided in this chapter" and to adopt rules, regulations, orders and directions "which shall not be inconsistent with the provisions of this chapter and the [State] sanitary code" and which "shall be known as the sanitary code of such district." However, section 347 (1) (a) recognizes that rules and regulations may be "adopted by a board of health *or a county officer or body exercising the rule-making functions of a board of health"* (added by L 1974, ch 199; emphasis supplied). Section 351 provides for the appointment of a "county health commissioner" who shall serve for a term of six years and "possess such qualifications for office as are prescribed in the sanitary code." Prior to 1975, section 351 allowed for the appointment of a County Health Commissioner by the Board of Health; however, since 1975 the statute has also endorsed appointment by the County Executive "in those counties

where the county charter provides" (added L 1975, ch 83). The Commissioner's powers and duties are described in section 352. Significantly, County Health Commissioners possess all the powers of local health officers and additional powers which may be delegated to the Commissioner "with the approval of the county board of health, *or the county manager or county executive in those counties having an optional or alternative form of county government*" (Public Health Law § 352 [3] [a]; [4]; emphasis supplied).

Onondaga County did not adhere strictly to these guidelines in the formation of the County Health Department and Board of Health, the appointment of and delegation of power to the County Health Commissioner, or the adoption of the local Sanitary Code. Contrary to Public Health Law § 340, the County Charter provides for a "Health Advisory Board", rather than a Board of Health. Consistent with the designation of the Board as an advisory body, the Charter assigns the various powers of a Board of Health as defined in the Public Health Law to the Board of Supervisors (now the County Legislature), the County Executive and the County Commissioner of Health. Under the Charter, the function of the Health Advisory Board is to "advise on matters relating to the preservation and improvement of the public health" and, "subject to the approval of the commissioner", to "recommend and submit to the board of supervisors for adoption" a County Sanitary Code "not inconsistent with the public health law or state sanitary code". The Charter delegates the power to appoint the Commissioner of Health to the County Executive, establishes a term of four years for the office of Commissioner, and assigns to the Commissioner all the powers conferred or imposed by law upon County Health Commissioners or County Boards of Health (Onondaga County Charter, art XVI). Pursuant to the Charter, Onondaga County's Sanitary Code was adopted by the County Legislature. The Code delegates to the Commissioner of Health "the authority to require and order that Fluorine Compounds be added to any or all the public water supply serving the County of Onondaga" (Onondaga County Sanitary Code, art III, § B).

The County's authority to supersede the provisions of the Public Health Law derives from the home rule provisions of the State Constitution (NY Const art IX) and the County Charter Law (Municipal Home Rule Law, art 4, part 1). The home rule provisions of the Constitution "evince a recognition that essentially local problems should be dealt with locally

and that effective local self-government is the desired objective" *(Matter of Kelley v McGee,* 57 NY2d 522, 535). Article IX contains a "Bill of rights for local governments" which states that counties "shall be empowered by general law * * * to adopt, amend or repeal alternative forms of county government" (NY Const, art IX, § 1 [h] [1]). Municipal Home Rule Law § 33 (4) (a) declares that a county shall have the power to adopt a county charter which may "[a]ssign executive or administrative functions, powers and duties to elective or appointive officers." The Court of Appeals has stated that the history of these home rule provisions "demonstrates the evolution of county governments from their previous status as administrative arms of the State to their present status as more autonomous units of local government" and that "[t]he power granted to counties over the nature and functions of its local offices is a significant one, extending even to the power to abolish those offices under certain circumstances" *(Matter of Kelley v McGee, supra,* p 536). However, "[i]t is well established that the home rule provisions of article IX do not operate to restrict the Legislature in acting upon matters of State concern" *(Matter of Kelley v McGee, supra,* p 538) and that "[s]o long as there exists a substantial degree of State interest in the subject matter of the legislation, evidence of local concern is of no consequence" *(Matter of Radich v Council of City of Lackawanna,* 93 AD2d 559, 566, *affd* 61 NY2d 652). Thus, in any case arising under article IX the test for resolving conflicts between State legislation and charter law is whether the State enactment reflects "an appropriate level of State interest" *(Matter of Kelley v McGee, supra,* p 540) in a subject matter "of sufficient importance to the State generally to render it a proper subject of State legislation" *(Matter of Kelley v McGee, supra,* p 538) that it may not be superseded by inconsistent county charter law.

Municipal Home Rule Law § 34 imposes express limitations on the powers of counties to adopt charters or charter law; however, the Public Health Law is not "included among the chapters [of the consolidated laws] which 'charter' counties are prohibited from superseding" *(Nydick v Suffolk County Legislature,* 81 Misc 2d 786, 790, *affd* 47 AD2d 241, *affd* 36 NY2d 951). Since "[t]he restrictions on the power to adopt charters * * * do not encompass a requirement of consistency with general law" *(Matter of Heimbach v Mills,* 67 AD2d 731, 732), except through Municipal Home Rule Law § 34, it follows that county charter law may be superior to the provi-

sions of the Public Health Law especially where, as here, the conflict concerns matters of administration and procedure. That public health and safety are matters of State-wide importance is beyond cavil *(see, Matter of Kelley v McGee, supra,* p 538; *Adler v Deegan,* 251 NY 467) and it is obvious that a local government should not be allowed to ignore substantive requirements of the Public Health Law and the State Sanitary Code intended to protect the health of all the citizens of the State. On the other hand, the administration of a county health district is a matter of local concern. The Public Health Law in its present form does not reflect a sufficient level of State interest in the subject to warrant the conclusion that the Legislature considers the organization and administration of county health districts a matter of State concern which may not be varied by local legislation *(see, e.g.,* Pubic Health Law § 347 [1] [a]; §§ 351, 352 [3] [a]; [4]).

The villages' additional claim that the Commissioner did not comply with the requirements of the State Environmental Quality Review Act (ECL art 8) is without merit. The effect of the Commissioner's orders is to require that application be made to the State for permission to add fluoride to the water. He cannot compel the addition of fluoride absent the approval of the State Commissioner, nor does he have any responsibility to choose a particular method for adding the compounds. Although the Commissioner's policy decision that fluoridation is in the best interest of village residents undoubtedly constitutes an "action" under SEQRA *(see,* 6 NYCRR 617.2 [b] [2], [3]), it qualifies as "routine or continuing agency administration", a type II action (6 NYCRR 617.13 [d] [15]) which does not require any procedure under SEQRA (6 NYCRR 617.13 [a]).

Accordingly, the judgment dismissing the petition should be affirmed.

CALLAHAN, J. P., DOERR and BOOMER, JJ., concur.

Judgment unanimously affirmed, without costs.